TUCKER, Judge.
Burns brought a bill in chancery in Berkeley county court against Michael Engle and Philip Engle, setting forth', that in 1787, he purchased of Michael a tract of land now claimed by Philip, at the rate of forty shillings an acre, Pennsylvania money; for which he paid down ¿49. 5. ; and, at the same time, gave his bond for ¿113, payable in September 1788 : And that he hath paid Michael, on account of the purchase, ¿68. 19. 8. Pennsylvania currency, and is ready to pay the balance upon receiving a right to the land; which the defendant engaged to make him, as will appear by a bond dated the 20th of December, 1787, executed by Michael for the above purpose, to which he refers, and prays it may be made a part of his bill. That notwithstanding Philip was well acquainted with his purchasing the land from Michael in a fair and honest manner, and knew of his paying money on account of the purchase, the defendants combining together to deceive, injure and cheat him out of the land, by buying and ^selling the same, the defendant Michael gave, to the other defendant, Philip, a deed for the same, which is of record. All which is contrary to equity, &c. The bill therefore requires, that the parties may answer the premises fully, and more particularly may set forth, whether the defendant Michael did not sell the land to the complainant for the sum stated, and with the knowledge of the defendant Philip? Whether the complainant did not pay the consideration mentioned in the bill with the knowledge of Philip? Whether a bargain between the defendants did not take place subsequent to his purchase? And whether Michael did not give Philip a deed for the land? And prays for a conveyance, and general relief.
The defendant Philip answers, that, on the *1018 15th of October, 1787, colonel Darke, in the presence and at the request of Philip, purchased the land of Michael, then in Michael’s possession, and to which, as he is advised, Michael had an estate for life, and that himself was entitled to the reversion in fee, under his father’s will, to which he refers, as part of his answer, at the price of forty shilling's, Pennsylvania currency, per acre, and did actually then and there pay, to Michael, part of the purchase money, but how much, he does not precisely remember; and expressly charges that the whole purchase money, except about £20 Pennsylvania currency, is since paid to Michael: that Michael, on the -day of-, 1788, in compliance with his bargain, conveyed the land to the defendant Philip. Thdt he does not certainly know of any bargain between Burns and Michael for the land ; that he has, indeed, heard there was a bargain, but never heard the particulars ; and expressly denies he ever heard one word about it, until some time after his own bargain with, and considerable payments made to Michael; and as expressly avers, that neither he, nor Darke for him, ever made but one bargain, which was on the 15th of October, 1787, and denies all combination, and concludes with a general traverse.
It may save some trouble, in the future discussion of this cause, to remark, that the only charge of fraud contained in the bill against Philip Engle, or put in issue by it, is that he bought the land of Michael Engle ; got from him a deed for it, after the complainant had agreed for the purchase; and paid a part of the consideration money with full knowledge of those circumstances. But the answer contains a full denial of both those facts, and alleges a bargain made by Darke on behalf of Philip, and payment of part of the purchase money more than two months before the date of Burns’s bargain, or the payment of any money by him to Michael. The substantial point which is thus put in issue is the priority of the contracts ; the dates of which are precisely fixed ; the one by the bond, which is made part of the bill; the other by the answer. The date of Burns’s contract is not denied or put in issue ; nor is it alleged in the bill that any previous agreement, sanctioned by the payment of money, or by any other act, ever took place between the parties. The subject of enquiry then is, whether Philip’s bargain was, in fact, prior to the 20th of December, 1787 ; and, if so, whether it was a bona fide transaction between the parties?
Upon this point I shall examine the evidence.
William Darke says, That, after an unsuccessful overture to Michael to purchase the land on a former occasion, the latter came to his house, and told him he would let him have it for less than he had before asked; that, either on the 14th or 15th of October, 1787, he bargained for the plantation, and thinks he then told Michael, that it was for his brother Philip, and that he must make him a deed for it; at which time he paid part of the purchase money, and was to pay the rest in April following; that Michael was to take a waggon with three horses, in part payment, and the balance in money : that some considerable time afterwards, he heard that Michael had sold the land to Burns : that on his return from Alexandria, after the last mentioned period, he paid Michael a further sum of money, and in a few days *or weeks after, he received the whole, except a small part left to pay a debt to col. Morrow : That the bond he took of Michael for a conveyance of the land was made to Philip Engle, and that if he remembers right, he was a witness to it; that the bond was given up to Michael when he made the deed; that he has not, nor even had, any interest in the land ; and that, although he did believe, from reports, that Michael had made some bargain with Burns, he always heard and believed it was after he had sold it to him the said Darke.
A receipt, dated the 15th of October, 1787, from Michael Engle to William Darke, for part of the price of his land sold him, andan order from Darke in Michael’s favour for four dollars, paid by Henry Bedinger, are among the exhibits ; the date of this order is by Bedinger fixed on the said 15th of October, 1787, and that he paid the same, as appears from his day book. The receipt is substantiated by the depositions of Michael Bigerly, Thomas Johnson and John Hendricks, and corroborated by the testimony of Michael M’Cabe. Thomas Johnson also states, that, about the middle of October 1787, Michael Engle came to Darke’s house, where he then was at work, and asked him if he could make him a suit of clothes, and said that he had sold his plantation to Darke, about two months after the witness heard he had sold it to Burns. And John Darke says that Michael Engle told him of the sale to his father, about the same time.
To rebut this testimony arising not only from the positive averment in Philip Engle’s answer in a point responsive to the bill, and to the very git of the suit, but from collateral circumstances in evidence, as well as direct testimony, there is not in the record a single piece of testimony, or any circumstance whatsoever, that I have been able to discover, except the answer of Michael Engle, (which is not evidence against Philip, although it contains strong evidence for him, as to the payment of twenty half joannes) and the vague reference to the year 1787, in the deposition of Robert Dowry.
*1 am, therefore, perfectly satisfied, that Darke’s bargain with Michael Engle, was actually in October 1787; that he bona fide paid almost the whole of the purchase money; that Burns’s bargain was subsequent to that period, it being concluded on the 20th of December, 1787, but not before. And consequently, that the complainant has no equity against Philip Engle upon this point.
The actual priority of Darke’s purchase being thus, as I apprehend, fully established, 1 shall, before I proceed to the point insisted on by the counsel for Burns, viz. that Philip Engle had made himself liable by countenancing the fraud of Michael, make one enquiry, namely, Had Burns, at any time, notice of Darke’s prior purchase?
John Engle states, that William Burns asked him something concerning the purchasing of some land of Michael Engle, and that he told Bums that Michael had no right *1019 to sell the land, which Burns was about to purchase ; that he saw the parties together some time after, and heard Burns again propose purchasing land from Michael; that Michael gave the deponent an order on Burns for ten dollars; which he refused to pay, saying that when they concluded the bargain he would pay. Which conversation happened some months after Darke’s purchase for Philip.
If this fact be true, Burns, and not Philip Engle, was guilty of fraud; by endeavour-ing, in an underhand manner, to purchase from Michael what he had notice was already sold to Philip; and, in that case, the maxim that he that doth iniquity shall not have equity, comes home to Burns.
I shall now consider the second point insisted on by the appellees, vií; : That although Philip Engle’s purchase should be prior in time to that of Burns’s, his conduct in concealing his own purchase, and aiding Michael in drawing money from Burns in payment for the land, was fraudulent as to Burns, whose title, for that reason, is preferable in equity.
The rule laid down in the text of 1 Eonbl. 161, is, that where a man who has a title, and knows of it, stands by, *and either encourages, or does not forbid the purchase, he shall be bound, and all claiming under him by it; and this seems to be a just punishment for his concealing his right; by which an innocent man is drawn in to lay out his money.
The rule thus laid down, supposes the party to be present at, or conusant of, the treaty in which the fraud is practiced, and encouraging the purchaser, either in express terms, or by silence and concealment of his own title, to proceed in the purchase; and the cases of Hobbs v. Norton, 1 Vern. 136; Hunsden v. Cheyney, 2 Vern. 150, which is the strongest case there cited. Draper v. Borlace, 2 Vern. 370 ; Arnot v. Briscoe, 1 Ves. sen. 95 ; Raw v. Pole, 2 Vern. 239. And Berrisford v. Milward, 2 Atk. 49, cited in support of the rule, all proceed upon those grounds. In Beckett v. Cordley, 1 Bro. 357, lord Thurlow says, This court never binds a third person, but where there is notice of a treaty. And in Ibottson v. Rhodes, 2 Vern. 554, where a mortgagee being asked by the agent of a person about to lend money upon an estate, whether he had any incumbrance on it; answered he had not, the lord keeper ordered it to be tried at law, whether the agent told the mortgagee that his employer was about to lend money on the estate? In 9 Mod. 36, the party stood by and suffered a fraudulent treaty to go on. In Clare and the Earl of Bedford, an infant, nearly of full age, was bound, because he engrossed the deed. That, says lord Thurlow, was upon the principle that he knew of the transaction. In Mocatta v. Murgatroyd, 1 Wins. 393, the first mortgagee was witness to the second mortgage, and was therefore postponed. So in Berrisford v. Milward, 2 Atk. 49, with this additional circumstance, that he promised the mortgagor to rely on his person al security. There is no case in the books (says lord Thurlow), but where the party, to whom the fraud was imputed, was conusant of the treaty in which the fraud was practiced. In Stiles v. Cowper, 3 Atk. 692, where a remainderman in tail had, for six or seven years, received rent upon a lease for sixty-one years, made by his father, *who was only tenant for life ; during which time the tenant, at his own expense, had greatly improved the premises, the court declared, that when a remainder-man lies by, and suffers the lessee or as-signee to rebuild, and does not by his answer deny that he had notice of it (as Philip Engle does in this case), all those circumstances together will bind him from controverting the lease afterwards,
The rule laid down in X Eonbl. 162, note n., as cited from Fox v. Mackreth, 2 Bro. Ch. Cas. 420, is thus : If a man by the suppression of a truth which he was bound to communicate, or by the suggestion of a falsehood, be the cause of prejudice to another, who had a right to a full and correct representation of the fact, his claim shall be postponed to that of the person whose confidence was induced by his representation.
Having already said, that I am fully satisfied that Darke’s contract in behalf of Philip Engle, concluded with his knowledge, and at his request, was at least two months prior to the contract between Michael Engle and Burns ; if it shall appear from the evidence that Philip Engle either stood by and encouraged, or being present did not forbid Burns’s purchase, or disclose his own claim ; or that being applied to by Burns, or any one on his behalf to know whether he had any claim or title, as Burns intended to make the purchase if no prior title or bargain existed, he did either deny that he had any prior claim, or conceal the bargain made in his behalf by Darke, from the knowledge of Burns, such conduct would bring him within one, or both, of these rules ; and if charged in the bill, and put in issue, and proved, will postpone his claim to that of Burns.
But I can find no such allegation in the bill, the charge in which is confined to his supposed fraud in obtaining the lands in pursuance of a bargain made subsequent to that of Burns. These charges are in their essence as materially different as a charge of horse stealing in an indictment, and a charge of concealing a horse thief. And to my apprehension, evidence of the one in support of the other of these *charges is equally inadmissible, as if the prosecutor of the supposed horse thief were to offer evidence to support the charge that he had received the principal felon in his house. And if the maxim be true, that fraud shall never be presumed, but must be proved, I presume it is equally necessary that it should be specially charged in the bill, that the defendant may deny it by averment; for otherwise the fact of notice, or of fraud, will not be in issue. Mitf. 216. And would it not be a breach both of law and equity to condemn aman, in a heav} penalty, for a fraud disclosed in evidence, but not charged or put in issue by the pleadings between the parties ? Suppose, for example, the fraud that is disclosed in the evidence be proved only by one witness : if the defendant had been charged with this fraud in the most direct terms by the bill, and had answered and denied the charge with proper averments in his answer, the defendant could never have been condemned upon this evidence. *1020 But if we dispense with this strictness in the pleading's, a defendant can never be safe, because he may be condemned on collateral evidence of a fraud, with which not having been charged, he could not know it was necessary to defend himself against it.
But if it be supposed that this fraud is charged in the bill, then it is as clearly denied by the answer, which expressly denies all fraud and combination, and concludes with traversing all the matters alleged in the bill. Then how is it proved ?
There is not one title of evidence to shew that there was ever any communication between Philip Engle and Burns, about the land, either before or at the time of the bargain ; or any application from Burns, or any person on his behalf, to Philip for information, or any denial or concealment of his claim at any time whatsoever, unless such concealment (for there is not a shadow of proof of a denial) be inferred from the evidence of George Burns, who says, that some time before Michael Engle removed from this country, he and Philip came to the house of Burns, and wanted *flour, or some other articles, (but whether he obtained them or not, he does not say). That Burns observed to' them, that he was frequently paying sums which he might forget: To which Philip replied, that he knew of some money (not saying how much), which Burns had paid Michael in Martinsburg, and the witness understood it was in payment of land which Michael had sold Burns. This witness could not remember the year in which this conversation happened: But Frederick Blue speaks of Michael’s going to Burns for a barrel of flour about the first of May, 1788, which possibly was the same time; and, if so, about four months after Burns had made his bargain for the land.
This is the only evidence in the record, direct or indirect, between Philip Engle and Burns. It is not in proof that Burns at that time paid a farthing, or supplied Michael with the flour, or any other article to that amount. Taking the evidence as it relates to the money paid at Martinsburg to Michael, it does not appear but that Michael might have told him of it; or that he might have known it from a thousand other sources, without being present at the payment; nor does the amoun t, whether a shilling or ten pounds, or any other sum, appear in any part of the evidence.
Is it possible, upon this evidence, to bring the conduct of Philip upon this occasion, within either of the rules which I have cited from Eonblanque ? I think it impossible to do so.
But let it be supposed that, instead of this vague and uncertain testimony, the evidence had been, that Philip went with Michael to the house of Burns, and that Burns had paid Michael, in the presence of Philip, ten pounds, Philip all the while concealing his claim to the land, what is the measure of punishment' which equity would decree against Philip in such a case, he being before that time a bona fid& purchaser without notice, and for a valuable consideration paid for the land? Would equity, for this act of concealment, decree that he should lose his land, although worth a thousand or ten thousand pounds ?
*If equity would, in such a case, decree such a punishment, I should think that she would hereafter abandon her claim to the title of mild. Her punishments, on the contrary, may be considered as far exceeding those of our present or former penal code. If Philip Engle had robbed him on the highway, or had broken open his house in the day time, and stolen his money, our criminal courts would now inflict a punishment comparatively light, to that of a forfeiture of perhaps all his lands. Such a punishment would not, according to the principles of our law, be according to the degree of the fault, and the estate of the defendant.
Eetit be remembered, that I am now considering the case of the concealment as it relates to this time four months after the bargain, and to the subject then in hand, the payment of a sum of money.
The most that equity could do, under those circumstances, would be to decree that money to be re-paid with interest; and to make Philip liable for it, in case Michael should not be able to do it.
Such, then, as it respects Philip, is the utmost that this court .would decree against him, had the fraud been put in issue and proved. If he has any money of Michael’s in his hands, that ought to be paid over to Burns, and the court might proceed to decree him further relief against Michael. Of this, however, it will probably be unnecessary to say more.
My opinion is, that the chancellor’s decree should be reversed; that the bill be totally dismissed, as to Philip, with costs ; and that the court might make such a decree against Michael, as to afford the complainant all the relief against him, that it may be in the power of the court to afford him.
In this opinion, I am the more confirmed by the deposition of John Engle, (which I have already, noticed), who says, that he told Burns of Darke’s bargain for the land, before Burns agreed with Michael for it. From that moment he was chargeable with the fraud which he now imputes to Philip.
' *ROANE, Judge.
In the view I have taken of this case, it is unnecessary to enquire minutely, Whether the purchase of Philip Engle, or that of Burns, was prior in point of time? I think, however, that throwing out of the case the answer of Michael Engle, and the testimony derived from him, the testimony preponderates in favor of the priority of Philip Engle’s purchase. Nor do I deem it material to enquire at what time the purchase of Burns became known to Philip Engle, or whether, at such time, he, Philip Engle, had paid the whole of his purchase money, or not? This I go upon, that he, Philip Engle, claiming by purchase from Michael Engle, stood by, and concealed his purchase ; suffered Burns to go on, without objection, and conclude his purchase : Nay more, was active in leading Burns on to pay up his purchase money. To make the case still stronger, he, Philip Engle, received as it were, a consideration for one of these payments by Burns, he being thereby released from a suretyship for Michael Engle. The testimony of George Burns shews, that Philip Engle encouraged Burns to pay money on account of the land, in an *1021 address to Burns himself. I say on account of the land ; because it is neither shewn, nor pretended, that any money was due from him on any other account. The evidence of George Burns (page 14) is clear enough, that the money was paid on account of the land. The word “understood” must be taken to be an understanding at that conversation, and for the parties themselves. The testimony of Slaughter and Dowry shews, that Philip Engle was instrumental in procuring such payments from Burns ; and, if Burns were not actually present at the time, it is immaterial, if he had a knowledge of such conduct on the part of Philip Engle, as implied his assent to his (Burns’s) purchase, and a waiver of his own.
The ground on which a man is bound, who has a title, and stands by, and either encourages, or does not forbid a purchase, or the completion of the purchase, (for I make no distinction between the two,) is, that of an implied assent *to such purchase. 1 Eonbl. 151. This assent is as much to be inferred from the encouragement to pay a small sum, as the whole purchase money ; for the purchaser inferring such assent from such payment, may reasonably go on thereafter to complete his purchase. To protect the first purchaser from the effect resulting from such partial payment, it is incumbent on him to shew an intermediate prohibition of payments on his part, or retraction of such assent. This is not done in the present case; and whatever conclusion may result from the other depositions, that of George Burns will sustain the appellee on this principle. If under this principle, a penalty or punishment results to the person encouraging, by his concealment, it is better that it should fall on him, than on an innocent man, thus drawn in, by him, to lay out his money ; it is immaterial, in the eye of equity, whether injury has arisen from a suggestion of falsehood, or the concealment of truth from a party having a right to a communication thereof. In a case, like the one before us, the person induced or encouraged, has certainly a right to be informed of the claim or right of the adverse party, if it be intended to be relied on.
These principles are too self-evident to need the support of particular decisions. Such, however, I apprehend, may be readily found.
The conduct of Philip Engle thus tending in conjunction with Michael Engle to defraud a third person, being more than a mere concealment of facts which ought to be disclosed, and producing the actual benefit to Philip Engle, which is before mentioned, ought to be discountenanced in a court of equity. It actually ratified the purchase of Burns, though subsequent to his own purchase.
It now remains to enquire, whether Burns, by these acts, acquired a life estate, or an estate in fee, in the premises in question? If Michael Engle took a fee under his father’s will, it is unnecessary to enquire, whether, or not, the reversion of Philip Engle would have passed to Burns by this conduct of Philip Engle, on a supposition that he, Michael *Engle, took only a life estate. This latter enquiry is susceptible of various views, but perhaps need not be discussed. If decided, it ought, perhaps, clearly to appear, whether Philip Engle undoubtedly understood Burns as having purchased the fee from Michael Engle ; for if not, if only a life estate was, or reasonably might have been understood by him to be purchased, it was not only unnecessary for him to have disclosed his claim to the reversion, but á forfeiture of such reversion by him for the concealment, would both seem too rigorous in a court of equity, and also perhaps be going beyond the principle pervading these cases, namely, that the purchase of the person encouraged or induced, is ratified. The case of Watson v. Powell, 3 Call, 306, seems, however, to render this enquiry unnecessary, and to settle the question that Michael Engle took under his father’s will, and could consequently convey a fee. Whatever opinion I might have as to that case' considered as a new one ; however I might be disposed to doubt, whether any great stress should be laid in inferring the intention of a testator from mere words of course, from the formu-lary expressions of the scrivener, from words which exist in all wills whatsoever, and which would therefore prevent, in almost all cases whatever, any such thing being conveyed by will, as an estate for life, except such estate be expressly limited therein, (I speak now without reference to the act of 1786), I deem myself bound by that decision, and shall not attempt to disturb it. It is a very great evil that the rules of property should be perpetually fluctuating and uncertain.
As to the matters put in issue in this case, the bill calls on the defendant to say, whether he, Burns, did not pay his purchase money with the knowledge of Philip Engle? This is a point to which Philip Engle does not choose to answer ; but it is certainly charged in the bill, and put in issue, and is the turning point in the cause.
As to an express charge of fraud, it is enough to charge fraud, by chargingcircum-stances which involve fraud. There is some little obscurity in the bill upon this subject *with relation to the words “ and that by the knowledge of Philip Engle,” whether they are referable to the previous or subsequent question, (here a ref- . erence was had to those questions, from the record) : I infer, however, that they refer to the former, because such words would be absurd, if applied to the succeeding question.
As to John Engle’s deposition, it does not appear from it, that Burns, when he purchased, knew of Philip Engle’s purchase.
My opinion therefore is, that the appellant do convey the land aforesaid to the appellee ; and deliver up possession thereof, and account for the profits.
PEEMING, Judge.
Michael Engle, without the least regard to principle, first sold the land to Darke on behalf of Philip Engle ; and afterwards to Burns ; who was imposed upon both by Michael and Philip. Eor Philip knew of the sale to Burns ; was present when part of the purchase money was paid; and industriously concealed his own prior contract. The consequence is, that Philip’s claim must be postponed to that of Burns’s. Eor if a man stands by, and sees another purchasing land to which he has a prior claim, and does not disclose it, his concealment is a fraud, which forfeits his title. *1022 1 Eonbl. Eq. 151. I am therefore of opinion, that there should be a conveyance of the land to Burns.
CARRINGTON, Judge.
Philip Engle connived at the sale to Burns; and was present when several payments were made, without disclosing his own claim, which must therefore be postponed to that of Burns’s. Por the concealment was a fraud, which forfeited his title. I think, therefore, that there should be a decree for a conveyance of the land to Burns. •
*BYONS, President.
Burns is entitled to a decree for a conveyance of the land; and the following is to be the entry : .
“ The court is of opinion, that so much of the decree of the high court of chancery, as reverses that part of the decree of the county court, which ordered the appellant to convey the land in controversy in fee simple to the appellee, and directed that he should only convey all the right in the land and premises which he derived from the defendant Michael Engle, to the appellee, is erroneous; that the said decree of the high court of chancery is also erroneous in this, in not directing an account to be taken of the monies stipulated to be paid by the appellee for the purchase of the said land, and actually paid by him, that a decree may be made thereupon according to equity, for the benefit of the appellant so far as he shall appear entitled thereto; but that there is no error in the residue of the said decree. Therefore it is decreed and ordered, that so much of the said decree of the high court of chancery, as is hereby declared erroneous, be reversed and annulled ; that the appellant forthwith convey the said land to the appellee in fee simple, with warranty against himself, and all persons claiming under him ; that he also forthwith deliver possession thereof to the appellee ; that an account be directed to be taken of the purchase money aforesaid, for the benefit of the appellant, so far as he shall appear entitled thereto, according to equity ; that the laud aforesaid be held subject to any balance which may be found due to the appellant; that the rest of the said decree of the high court of chancery be affirmed; and that the appellant pay to the appellee, as the party more substantially prevailing in this court,' his costs by him about his defence in this behalf expended.”